DANIEL G. BOGDEN
United States Attorney
CRISTINA D. SILVA
Assistant United States Attorney
Lloyd D. George United States Courthouse
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336/Fax: (702) 388-6418

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

IN RE: THE MATTER OF EXTRADITION

OF MARC ADAM

CASE NO: 2:13-mj-00882-VCF

### MEMORANDUM OF LAW IN OPPOSITION TO BAIL

The fugitive, MARC ADAM ("Adam" or the "fugitive"), was arrested on November 3, 2013 pursuant to a complaint and warrant issued by U.S. Magistrate Judge Deborah A. Robinson, in anticipation of Canada seeking the fugitive's extradition to Canada, pursuant to an extradition treaty between Canada and the United States, 27 UST 983, TIAS 8237 (hereinafter, "the Treaty"), and pursuant to 18 U.S.C. § 3184 *et seq*. Magistrate Judge Robinson signed the warrant for arrest for extradition on November 1, 2013 based on an urgent request for provisional arrest received from Canada, and made pursuant to Article 11 of the Treaty which allows for the application of a provisional arrest in urgent circumstances. On November 3, 2013, a superseding criminal complaint also charging a violation of Title 18, United States Code, Section 3184 *et seq.*, was filed in this District. *See* Doc. #3. The fugitive is currently in the custody of the United States Marshals.

Authorities in Canada seek the extradition of MARC ADAM to face criminal charges for allegedly abducting of his two children in contravention of section 283 of the Criminal Code of Canada. Adam was charged on October 29, 2013, in the District of Kamouraska in the Province of

1

1  Québec with one count of child abduction. Article 2 of the Treaty provides for the extradition of

2  persons accused or convicted of these crimes. The District of Kamouraska in the Province of Québec,

3  Canada issued a warrant for the fugitive's arrest on October 29, 2013 **based on one count of**

4  **abduction of his children.**

5      The United States, in execution of its treaty responsibilities and acting at the request of

6  Government of Canada , urges that the fugitive be held without bond pending receipt of the formal

7  request for extradition and  the hearing on the certification of the extradition pursuant to 18 U.S.C. §

8  3184 *et seq*. and files this memorandum in support thereof.

9      **I.     APPLICABLE LAW**

10     The federal statute governing extradition procedures in the United States pursuant to treaties

11 with other nations, 18 U.S.C. §§ 3184 *et seq.*, does not provide for bail.  Further, an extradition

12 proceeding is not a criminal case.  *See Kamrin v. United States*, 725 F.2d 1225, 1227-1228 (9th Cir.

13 1984); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). Consequently,

14 the Bail Reform Act, Title 18 U.S.C. §§ 3141 *et seq.*, and its criteria governing the allowance and

15 the amount of bail in United States criminal cases do not apply in extradition matters.  The Bail

16 Reform Act applies only to "offenses" against the United States that are triable in United States

17 courts.  *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  The fugitive ADAM is **not** charged with an

18 "offense" within the meaning of 18 U.S.C. § 3156. [1]  Instead, ADAM  is charged with **child**

19 **abduction** against the Requesting State, Canada. *See Matter of Extradition of Rouvier*, 839 F. Supp.

20 537, 539 (N.D. Ill. 1993); *Matter of Extradition of Sutton*, 898 F. Supp. 691, 694 (E.D. Mo. 1995);

21 *Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D. Nev. 1993); *United States v.*

---

[1] The term "offense" for the purposes of Section 3141 is defined in 18 U.S.C. § 3156(a)(2) as "any criminal offense, other than an offense triable by court-martial, military commission. provost court, or other military tribunal, which is in violation of an Act of Congress and is triable in any court established by Act of Congress. . ."

*Wroclawski*, 574 F. Supp. 2d 1040, 1044 (D. Ariz. 2008)4'4

Similarly, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to international extradition proceedings.[2] Fed R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101 (d)(3); *See also, Afanesjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981); *Bovio v. United States*, 989 F.2d 255, 259 n.3 (7th Cir. 1993).

### A. A Strong Presumption Against Bail Governs In An International Extradition Proceeding

The overwhelming weight of authority supports the strong presumption against the granting of bail in international extradition cases. Both the United States Supreme Court and the federal courts of appeals have long held that bail should be granted in only the most unusual of circumstances.

In the landmark case *Wright v. Henkel*, 190 U.S. 40 (1903), the Supreme Court affirmed the detention without bail of a fugitive sought by Great Britain for defrauding a corporation of which he was a director. The United States argued in *Wright* that extradition courts were without power to allow bail because no statute provided for such power. *Id.* at 55. The Court stated that it was unwilling to hold that the circuit courts do not possess power with respect to admitting fugitives to bail other than as specifically vested by statute, but cautioned that " . . . bail should not ordinarily be granted in cases of foreign extradition . . . ." *Id.* at 63.

In establishing this presumption against bail, the Supreme Court in *Wright* explained that when a foreign government makes a proper request under a valid extradition treaty, the United States

---

[2] Although the issue before the Court is the fugitive's request for bail, it also should be noted that neither the prohibitions against hearsay, *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980), nor the Sixth Amendment's guarantee to a speedy trial, *Jhirad v. Ferrandina,* 536 F.2d 478, 485 n. 9 (2d Cir. 1976), *cert. denied*, 429 U.S. 833 (1976), *reh. denied*, 429 U.S. 988 (1976), apply to international extradition proceedings.

3

1  is obligated to deliver the person sought after he or she is apprehended:

2  > The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

6  *Id.* at 62.

7      The reasons for this presumption against bail in international extradition cases are clear and compelling. First, it is necessary for the United States to meet its legal treaty obligations. A person sought for extradition already is an international fugitive from justice; it is reasonable to think that person would flee if alerted to the charges. Even if the person were not in flight, the fact of an impending extradition to a foreign country to face serious criminal charges, the outcome of which is uncertain, is itself a strong incentive to flee.

13      Further, the ability of the United States to deliver fugitives pursuant to extradition requests has significant international law implications. The international legal system depends wholly upon the respect of its members for the obligations into which they freely enter. When, as here, the Government of Canada meets the conditions of the treaty, the United States is obliged to deliver the fugitive. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Wright*, 190 U.S. at 62; *see also United States v. Leitner*, 784 F.2d 159, 160-61 (2d Cir. 1986)(the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

23  …

24  …

4

**B.      The Fugitive Must Establish "Special Circumstances" and Must Not Pose a Risk of Flight for the Court to Consider the Question of Bail**

In light of the strong presumption against bail established in *Wright*, the federal courts have uniformly held that bail shall not be granted except under "special circumstances." *See United States v. Leitner*, 784 F.2d at 160 (bail in extradition cases should be granted "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory"), (quoting *In re Mitchell*, 171 F. 289 (S.D.N.Y. 1909) (Hand, J.); *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989)("only 'special circumstances' will justify bail"); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991)("in a case involving foreign extradition, bail should not be granted absent special circumstances"). Moreover, the burden is on the fugitive to establish the existence of special circumstances warranting the granting of bail. *See Salerno*, 878 F.2d at 317-18; Leitner, 784 F.2d at 160.  The Government notes that some District Courts have required fugitives to establish "special circumstances" by clear and convincing evidence.  *See In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1214-15 (D. Nev. 1993); *In re Extradition of Mainero*, 950 F. Supp. 290, 294-95 (S.D. Cal. 1996); *But see In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n.4 (C.D. Cal. 2006) (rejecting heightened standard adopted in *Nacif-Borge* and applying preponderance of evidence standard). Here the defendant has failed to demonstrate **any** special circumstances.

Notably, the courts have determined that certain circumstances are not "special" and do not justify the release of a fugitive during extradition proceedings.  Foremost, the absence of flight risk is consistently held not to constitute a special circumstance.  Rather, the absence of a risk of flight and a finding of special circumstances are each independent requirements for bail in an extradition case.  Therefore, to qualify for bail, a fugitive is required to make a two-part showing that: (1) he or she is not a flight risk and (2) that "special circumstances" exist warranting the granting of bail. *See e.g., United States v. Ramnath*, 533 F. Supp. 2d 662, 665 (E.D. Tex. 2008); *In re Extradition of*

*Molnar*, 182 F. Supp. 2d 682, 687 (N.D. Ill. 2002); *In re Extradition of Nacif-Borge*, 829 F.Supp. 1210, 1215 (D. Nev. 1993); *In re Extradition of Chapman*, 459 F.Supp.2d 1024, 1026-27 (D. Haw. 2006); *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035-36 (C.D. Cal. 2006). The absence of flight risk is consistently held to be a requirement separate from the special circumstances test.

To illustrate, in *Leitner*, the fugitive was a United States citizen, who had been arrested in Israel and charged with acts of terrorism against Arabs. Israeli authorities freed Leitner on bail after he agreed to cooperate with them. After receiving death threats, Leitner fled to his home in the United States and lived openly under his own name for a year and a half. He attended law school, drove a taxi under his own name, and lived with or frequently visited his parents. Based upon the foregoing, the Magistrate Judge found that Leitner did not pose a flight risk. The Second Circuit, in affirming the district court's reversal of the grant of bail, held that the lack of flight risk was not a "special circumstance." 784 F.2d at 161. *See also, Salerno*, 878 F.2d at 318 (flight risk "is not a criteria for release in an extradition case"); *Matter of Russell*, 805 F.2d 1215, 1216 (5th Cir.)("[b]eing a tolerable bail risk is not in and of itself a special circumstance"); *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979)("even applicant's arguable acceptability as a tolerable bail risk" is not a special circumstance). Instead, absence of flight risk is an independent and additional condition that must be demonstrated to warrant bail.[3] Similarly, findings regarding danger to a community both here and abroad would preclude bail, even in the face of arguably

---

[3] Courts differ in the order in which they consider flight risk and special circumstances. Some courts evaluate potential flight risk before proceeding to any special circumstances analysis. *E.g., Extradition of Molnar*, 182 F. Supp. 2d at 687; *United States v. Taitz*, 130 F.R.D., 442, 445 (S.D. Cal. 1190). Other courts first determine special circumstances and then consider the potential for flight. *E.g., Extradition of Morales*, 906 F. Supp. at 1373; *Extradition of Nacif-Borge*, 829 F. Supp. at 1216; *Extradition of Mainero*, 950 F. Supp. 290, 295 (S.D. Cal. 1996). Regardless of the order of consideration, case authority is clear that both special circumstances must be demonstrated **and** lack of flight risk must be established to grant bail. Practical considerations and judicial economy suggest determinations as to flight risk and danger to the community be made first.

special circumstances. *See In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 735 (W.D. La. 1999); *Ramnath*, 533 F. Supp. 2d at 665; *Extradition of Molnar*, 182 F. Supp. 2d at 687; *Extradition of Nacif-Borge*, 829 F.Supp. at 1215; *Extradition of Santos*, 473 F. Supp. 2d at 1035-36. [4]

Assuming the fugitive is not a risk of flight and poses no danger to the community, the fugitive must make an affirmative showing of special circumstances. Courts have declined to find "special circumstances" based on: (1) the need to consult with one's attorney and/or participate in pending litigation; (2) the complexity of the pending litigation; (3) health issues including discomfort, dietary needs, or associated health concerns while incarcerated; (4) United States citizenship or pendency of naturalization proceedings; (5) political or professional status;[5] (6) the availability of electronic monitoring;[6] and (7) the fugitive's character, past conduct, and/or ties to the community;[7] (8) ordinary delay or delay occasioned by the fugitive in the course of extradition

---

[4] In a decision in a U.S. criminal case, the Ninth Circuit rejected the contention that under the Bail Reform Act a court must limit its evaluation of a defendant's potential danger to a geographic location within the United States. *United States v. Hir*, 517 F.3d 1081, 1088-89 (9th Cir. 2008). Instead, the court held that, if the defendant is charged with a crime punishable under U.S. law, the court may consider the danger posed to a foreign community, reasoning that the effect of the alleged offense occurs abroad. *Id.* In the international extradition context, where the Bail Reform Act does not apply, there is an even greater justification for extending consideration of the threat that a fugitive might pose to a community beyond the U.S. borders. Requests by other countries for extradition of a fugitive by definition comprise violations of foreign law having a primary adverse effect on the foreign community. If a court, in making its danger to the community determination, were limited to considering only geographic areas located in the United States, the court would be forced to ignore the potential danger a fugitive's release could be in a foreign location where crime was committed.

[5] *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 131 (E.D.N.Y. 2001) (standing as member of Russian-Belarus Union not special circumstance); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991)("mere fact that a respondent is a doctor-even a highly trained one-cannot be a "special circumstance" within the meaning of Wright, unless we are prepared to say that the normal rules of extradition are not going to apply to doctors by virtue of who they are").

[6] *Matter of Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997); *United States v. Hills*, 765 F. Supp. 381, 389 (E.D. Mich. 1991).

[7] A fugitive's character, including past conduct, lack of a prior criminal record, and ties to the community should not be considered a special circumstance. Instead, and as most district courts have recognized, a defendant's character is more appropriately considered when conducting the independent flight risk analysis. *In Matter of Extradition of Nacif-Borge*, the court explained that

proceedings; (9) substantial likelihood of success against extradition or action in requesting country; and, (10) availability of bail for the same offense in the requesting country.

While in certain exceptional cases some of the above may have been deemed a special circumstance, for the most part, where a court determines special circumstances to exist it is generally based on a confluence of factors, as opposed to any single consideration. Such findings are very case specific and within the discretion of the court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

## II. THE FUGITIVE POSES A RISK OF FLIGHT AND HAS FAILED TO ESTABLISH SPECIAL CIRCUMSTANCES

The fugitive in this case has not met his/her burden and the Court should deny his/her request for bail.

A fugitive charged with crimes in another country is already by definition in flight or deliberately absent from that jurisdiction. Here the strong presumption against bail is supported by the fact that for approximately six days the whereabouts of Marc Adam and his children were unknown to the mother and to law enforcement. Adam's actions show that he had a clear intent to evade law enforcement and to deprive the mother of his children of her rightful custody of the children, and further that he is unstable. The facts detailed herein, which are based on information from Canadian law enforcement authorities and U.S. law enforcement authorities, show that Adam

---

"[m]ore often, the character and background of a person subject to extradition are considered in regard to risk of flight and danger to the community rather than as a special circumstance." 829 F. Supp. 1210, 1220 (D. Nev. 1993). *See also Matter of Extradition of Sidali*, 868 F. Supp. 656 (D.N.J. 1994) (rejecting "extraordinary character" based on employment, family ties, no prior record, and community respect as a special circumstance); *In re Extradition of Valles*, 36 F. Supp. 2d 1228, 1231 (S.D. Cal. 1998) (fugitive's past conduct and community ties used to assess flight risk).

Although some courts have included character, past conduct, and ties to the community in their assessment of special circumstances, these decisions are generally distinguishable on the facts and rely on the presence of other circumstances. *See, e.g., United States v. Taitz*, 130 F.R.D. 442, 445-46 (S.D. Cal. 1990) (acknowledging character as special circumstance in addition to religious needs, likelihood of delay, health risks, and availability of bail in foreign country).

1  planned his departure from Canada and while he travelled through the U.S., refusing to reveal his

2  whereabouts to the mother and law enforcement, was in communication with his paramour (Ms.

3  Robbins) telling her that if his wife started making trouble he would ask for money for the children's

4  education.

5  Marc Adam's flight from justice began on Monday, October 28, 2013, when his wife,

6  Solange Bergeron, discovered that Adam had left the house with the two boys and that clothing and

7  the children's belongings were missing. U.S. authorities confirm that Adam crossed over into the

8  United States in Ogdensburg, New York on October 28th.  Adam's spoke to his wife, via telephone,

9  on October 28th and told her he was not coming back to Canada and that if she wanted to see the

10  children again, she had to join him in the United States.   Ms. Bergeron told Canadian law

11  enforcement that Adam had been obsessed for a long time with moving to the U.S., and that she had

12  refused, and had also refused to have passports issued for the children because she feared that it

13  would allow him to leave Canada with them.  Ms. Bergeron did not give Adam permission remove

14  the children. Ms. Bergeron told Canadian law enforcement that Adam pressured her into signing the

15  document authorizing him to register the children in a good school because Adam's told her that the

16  document would secure the children from a civil action that he thought would be filed against him in

17  relation to the sale of a house.  Adam has been unemployed in Canada for many years and Ms.

18  Bergeron is the sole support for the family. Ms. Bergeron did sign the document, which is attached

19  as Exhibit A, and makes no reference to allowing Adam to remove the children from Canada.  Ms.

20  Bergeron was never intended to allow Adam to remove the children from Canada.  Clearly, Adam's

21  intention all along has been to remove the children and deprive his wife of her lawful care and

22  charge of the children.

23  Ms. Bergeron reported the taking to the Gatineau City Police, who commenced an

24  investigation. On October 29, 2013, a Canadian investigator contacted Adam on his cell phone;

1    Adam answered the phone but refused to give his location, despite being told by law enforcement
2    that he was committing parental abduction and that an arrest warrant would issue.
3    　　　The Royal Canadian Mounted Police, Missing Children Section, then became involved in the
4    investigation and reached out to American authorities.  During this time, Adams was in
5    communication with his paramour and from his communications, it is clear that his intent was to
6    deprive the mother of custody of the children.  In emails to Ms. Robbins, he said he had consulted
7    with lawyers before he left, and referenced the letter Ms. Bergeron signed regarding registering the
8    children in school, he makes no reference to the allegation made to this Court, that the letter allows
9    him to register the children in a school in California.  Adams tells Ms. Robbins that if his wife starts
10   to make trouble, he would ask for a lot of money for the kids education.  In an earlier email to Ms.
11   Robbins, he stated that the children did not have passports, but that they crossed the border with the
12   children's health cards, and that his wife had always refused to sign the passports.  This statement
13   corroborates Ms. Bergeron's statements that she refused to have passports issued for the children for
14   the very reason that she feared he would take the children.  It is clear that he was planning his
15   abduction for some time. .
16   　　　On October 31, 2013, Canada requested that the United States provisionally arrest Adam,
17   based on urgent circumstances that his whereabouts were unknown and the abduction of his
18   children.  On Friday, November 1, 2013, Magistrate Judge Deborah Robinson issued the arrest
19   warrant.  Canada then submitted an urgent request for assistance, under the Mutual Legal Assistance
20   Treaty between Canada and the United States, for the issuance of an Order that would allow for the
21   U.S. to locate Adam via cell site location information.  Thereafter, and based on the knowledge that
22   Adam was operating with a cell phone in the U.S. and on information Canadian law enforcement
23   had received from the Canadian cell phone provider, two separate orders were urgently requested
24   and signed, in the U.S., and served on the phone provider Sprint, in order to assist in locating Adam

1   and the children.  The basis for the issuance of these orders (a search warrant and an order

2   authorizing the installation of pen registers and trap and trace devices) were based on the fact that

3   Adam had abducted his children, refused to tell law enforcement his whereabouts, and were made in

4   order to assist U.S. law enforcement who treated this matter on an urgent basis.

5        On Sunday evening, November 1, 2013, as a result of a combined effort of numerous law

6   enforcement agencies, including, the Royal Canadian Mounted Police, Surete du Quebec (Quebec

7   Provincial Police), the Prosecution Service of Quebec, the Canadian Department of Justice,

8   International Assistance Group, the U.S. Department of  Justice, Office of International Affairs, the

9   U.S. Marshals Service, the U.S. Attorney's Office in Washington, D.C. and in Kansas, and the U.S.

10  District Court in Washington, D.C. and Kansas, Adam was located and arrested at the Stratasphere

11  Hotel in Las Vegas, Nevada.  Child Protective Services (CPS) were notified, and on Sunday

12  evening, the children were taken into custody by CPS.

13       Based on all of the information provided above, it is clear that Adam does indeed pose a

14  flight risk, and that he can present no special circumstances that would warrant his release.   For six

15  days Adam's failed to inform his wife and mother of their children information regarding his

16  location.  Adam's has no ties to this community or any community in the United States.  Moreover,

17  per Adam's revised financial affidavit, he has no assets or access to assets, and they are in control of

18  his wife in Canada.  While Adam's has no criminal history, he is now facing serious charges in his

19  home country of Canada.  Indeed, the fugitive has demonstrated that he/she is highly adept at

20  moving his family and avoiding detection.  Hence, further flight from the United States to yet

21  another country or to an underground location in the United States is a reasonable assumption.

22  Given the serious nature of the alleged crime – that is parental kidnapping -- the community both

23  here in the United States and abroad is at risk were the fugitive released.  Because the fugitive is a

24  risk of flight, the Court need go no further in order to deny the application for bail.  The fugitive has

1  been unable to meet this necessary independent basis to obtain bail and the Court need not even

2  consider any arguments regarding special circumstances.

3  However, were the Court satisfied that the fugitive is not a flight risk and poses no danger to

4  the community here or abroad, the fugitive cannot demonstrate to this Court that "special

5  circumstances" exist which would justify bail in this case.  The fugitive has a heavy burden to meet

6  in proving the exceptional circumstances that would vitiate the strong presumption against bail.

7  Specifically, the fugitive in this case has provided no case law or other grounds that might constitute

8  special circumstances. In fact, the only thing he stated to the Court during the November 5, 2013

9  continuation of his detention hearing is that he has a document stating he had "permission" to bring

10 his children to the United States.  Yet, during that hearing Adam's failed to provide a copy of that

11 alleged documentation.  Likewise, he failed to provide the Government or this Court with any proof

12 of its authenticity, indeed the document that the U.S.  has provided, and which we can assume

13 Adam's is referring to, makes no reference to the U.S.  Unless there is some other document, it is

14 clear that Adam's intention was to mislead this Court.  Even if such a document exists (and if it

15 does, then proof of it should be presented to this Court and to the prosecutor), such alleged grounds

16 do not constitute "special circumstances" under the standards developed by courts following *Wright*.

17 An analysis of the facts in this case in light of these standards demonstrates that the fugitive has not

18 met his burden for the extraordinary relief he requests.

19 In essence, the fugitive's argument attempts to convince this Court that he is a good bail risk.

20 The fugitive's position, however, is legally insufficient under U.S. case law to justify granting bail in

21 an international extradition proceeding.  Allowance of bail in any amount would not guarantee the

22 fugitive's presence in court and would invite the possibility of embarrassing the United States in the

23 conduct of its foreign affairs.  While forfeiture of bail in domestic criminal cases is designed to

24 compensate, at least in part, the court that is seeking the accused presence for trial, forfeiture of bail

1  in international extradition cases due to the failure of the fugitive to appear would leave the

2  requesting country, here Canada, without either remedy or compensation.  Further, Adam's has no

3  assets with which to post bail.

4  Should, however, the Court be inclined to grant bail in this case, counsel for the Government

5  respectfully requests that the Court submit special written findings as to those specific matters that

6  are found to constitute "special circumstances." Moreover, in order to protect the ability of the

7  United States to meet its treaty obligations to the Government of Canada, counsel requests that the

8  Court notify the parties a reasonable time in advance of any contemplated release order in order that

9  the United States can consider the matter of whether, under the circumstances, to seek a stay pending

10  possible appeal on the bail issue.

**III.    CONCLUSION**

In sum, fugitive ADAM is a flight risk with absolutely no ties to the Las Vegas, Nevada community, or any community within the United States.  Moreover, he is facing criminal action if and when he returns to the country of Canada.   He has not demonstrated that "special circumstances" exist which would justify bond in his case.  Finally, the fugitive's release on bail would have negative implications for U.S. foreign policy in cases where the United States seeks extradition of fugitives from Canada.  Based on the foregoing, the United States requests that the fugitive's request for bail be denied.

Dated this 5th day of November, 2013.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney

//s//

CRISTINA D. SILVA
Assistant United States Attorney